Please be seated. And before we call this case, I also want to advise the parties that Justice Palmer is the third panel member on this case. He's unable to be here today, but he will obviously review the oral arguments and, of course, has all the briefs and will be able to fully participate in the decision. With that, we will call this case now. Case number 11-3583, Pupil v. James Scholl. With both parties, please step up and identify yourselves for the record. I'm Heidi Lynn Lambros from the Office of the State Appellate Defender for Defendant Appellant Jim Scholl. Good morning, Your Honors. My name is Myles Kelleher on behalf of the Pupil. And I should have asked you this before, because you've appeared here many times. Is your last name Lynn Lambros? Should I refer to you as? Lambros. Oh, sorry, Ms. Lambros. Each side will have 15 minutes, and from that, you may save out some time for rebuttal. Thank you very much. Good morning, Your Honors. Good morning. In 2010, Jim Scholl, a 39-year-old retired Marine, saw a large man lurking about his home at 10, 15 p.m. on a weeknight. He then heard a crash on the base of the stairwell. Scared and fearing for the safety of his neighbor, Tracy, who he had just seen and knew to be alone, Jim went downstairs with a gun. After knocking on Tracy's door, Jim was confronted with a large man, with Tracy nowhere in sight and nowhere to be heard. Scared and confused, Jim came inside the home and kept the large man at bay while he tried to figure out what was happening, who this man was, and where Tracy was and if she was okay. After several very confusing minutes of questioning, Jim realized that the large man was Frank, Tracy's friend and not a prowler. Jim then unloaded his gun, set it on the counter, gave Frank the bullets without incident. Jim was then arrested and convicted of home invasion and aggravated unlawful restraint and sentenced to the mandatory minimum of 21 years in prison. As Jim surrendered to Frank, though, and because he either reasonably or mistakenly believed that he had the right to enter the apartment to protect Tracy, both of Mr. Scholl's convictions should be reversed outright. The home invasion statute provides an unusual and barely mentioned affirmative defense called surrender, which allows a defendant to escape criminal liability when he surrenders to a person lawfully present without causing serious bodily injury. What do you think the purpose of this affirmative defense is? How is this supposed to be designed to protect? There's no legislative history about the defense, but around the home invasion statute itself, it seems that the legislators were worried about people mistakenly entering homes. In fact, the legislative history has some comments about people getting a little bit drunk and entering the wrong home with their gun and making mistakes and realizing their mistakes and then surrendering or giving up to the person lawfully therein. People who had no intent to commit a crime who just enter a home, maybe with their loaded gun, maybe they've been hunting, and find themselves in this situation. Is that in the legislative history? It's in the legislative history of the home invasion statute, actually. That this was to protect people coming in? The legislators were concerned, we know, when they drafted home invasion about situations where people accidentally come onto property, either for whatever reason, with their gun. They were concerned that there would be punishment or penalties for that. And I believe that the natural segue to the surrender portion and the immediately leaves is to provide kind of the accidental entrant who didn't have an intent. Do you think that this immediately leaves, that wouldn't apply here? No. No. And do you think the other one is to permit someone to otherwise complete an act and then be able to say, oh, I made a mistake, or I'm sorry, I surrendered after they'd been in an apartment for 20 minutes or so? No, I think that temporarily, although the statute doesn't provide for that, I think what it says is that once you know that someone is lawfully present therein, as Mr. Scholl didn't know that Frank was actually lawfully there, and the minute that he knew that you, sir, that I'm facing are not another intruder, you actually have a right to be here, I'm going to surrender myself, my gun, and my weapon to you. So although the statute, and again, this would be for this court to decide temporally how long this takes, this only took a few minutes. Did you argue that we should, that this would be a basis to reverse outright, that he established he surrendered? Isn't that a factual question, if it exists in this case? If it does exist for this case, I believe that this court can reverse this conviction outright. But if not, certainly counsel is ineffective for failing to read the statute and noticing that the surrender defense was available here in this case, especially since the actions of Mr. Scholl clearly showed that he surrendered. In fact, the state's witnesses said, we caught him, he was caught when he relinquished his weapon. So at the bare minimum, counsel should have read parts of the statute and noticed that this surrender statute, this defense also wouldn't have impeded with any self-defense claim that Mr. Scholl had. So doesn't this involve some type of subjective belief or feeling or knowledge at the time in terms of when you surrender? The surrender portion goes to whether or not, when I encounter someone who's lawfully present. That's all that we know from the statute. So doesn't it require some subjective thought? Yes, once I know that you are lawfully present therein, once I know that I'm caught. And again, being surrendering doesn't mean I surrender and I leave. It means I'm here, I did this, I did this action. It's an affirmative defense, meaning the defendant would have to admit that I entered the home seemingly without lawful authority. All right. So given that, going back to the statute itself, the state argues that, you know, there's various things that Mr. Scholl could have done, that the defendant could have done. Number one, he could have called out her name, right, to determine whether or not she was present in the premises or if she was in danger. What's your response to that? I mean, I've never been part of a home invasion. The state believes that those are some things that someone would do when they're confronted with this extremely tense and difficult conversation. He entered, he was looking around. She wasn't there. He doesn't know who this man is. She could have also called out and said, hey, get out of my apartment. I'm here, Jim, leave me alone, leave me alone. But he didn't see her. And his concern, as he says, was trying to keep this large man away from himself and away from wherever Tracy could have been done. He's not expected to exercise perfect judgment, but again, this is a very confusing, very quick thing. This wasn't hours and hours that went on. Tracy was hiding in the bedroom. She didn't make herself known, her presence known. Mr. Scholl knew that she was alone, that her boyfriend was coming home, you know, a little bit longer, but knew that she was by herself. He had just seen her. So to see this large man kind of lurking about, again, he was entitled to kind of investigate. He's entitled to have a gun on his own property and, you know, determine whether or not there is an intruder. What is your response, Ms. Lambros, to the state's suggestion that this statute is designed to have someone surrender once they are aware that there are people present, that it's designed to attack that situation, that if you know someone's there, then you don't have this defense? I agree with the state. There's two different parts of the home invasion statute. One is I enter knowing that people are present, and one is I enter a home and I remain when I knew or should have known people were present. Mr. Scholl wasn't convicted of the first type of home invasion. No. The state instructed the jury only that he entered and then remained when he knew or should have known people were present. So you're saying that the surrender defense is available in that situation? Yes, to the second form. The state could have charged both forms and they didn't. Now they're changing their theory here and saying, oh, we're going to say that this is the first form of home invasion, although they never charged that first form. Well, do you think an affirmative defense is available? I think I began with this when an act of home invasion has already been technically completed. I don't believe the home invasion was completed because he believed that he had lawful authority to enter. His intent was not to engage in a home invasion, and his intent was, again, to protect her. So it's without authority that makes it unlawful. Well, what about the fact that he basically held this other person at gunpoint for, what, 10 or 15 minutes and slammed the gun down multiple times? I mean, is there anything criminal about that? The state, again, the state did charge aggravated unlawful restraint, which is separate from this surrender defense of home invasion. There's a bunch of other things that the state could have charged. They decided not to. Again, this is an extremely tense situation. He's not a law enforcement officer. This is where he thinks that there's an intruder in his home with his neighbor and someone else's home. He doesn't know what's going on. Yes, he was maybe being, as he says, a bit dramatic. He was slamming the gun down trying to make a point. But, again, that doesn't negate the surrender defense. At the moment that he believed that Frank was not an intruder, that's the moment that he surrendered. That's the moment he said, I'm caught, I'm done, and he waited for the police. He's not a law enforcement, but on the other hand, he is a veteran. He was in the Marines. He's trained with a weapon. Is that something that we should take into consideration? I think it's into consideration that he knew how to use the weapon. He wasn't going to be reckless with it necessarily, that he had the hammer uncocked when he slammed it. In fact, at the end of it, he said that the reason why he didn't give Frank initially the gun was because he didn't want Frank to have the weapon in case the police came. He didn't want Frank to actually be in danger of being shot or being confused with being the person who had the gun. So I think his expertise in firearms goes to this isn't, say, me, you know, just grabbing a gun when I don't know how to use it. I mean, he was allowed to do this. He grabbed his gun. He searched around. It's kind of like taking a baseball bat and kind of looking around when you hear a noise in the middle of the night. What about the mistake of fact defense? The mistake of fact defense, again, nowhere in this record did defense counsel advance this mistake of fact defense. Although defense counsel argued it was a mistake, and Mr. Shor said, I'm sorry, I made a mistake. I believe that this was an intruder, that this was a prowler. But, again, that's another reason to reverse this outright. But at the bare minimum, counsel never advanced this very simple defense. When you say reversal outright, I'm not sure I understand that. The mistake of fact. The mistake of fact defense? I mean, the jury didn't hear that. They heard the defense of others. But I don't know where you leap to reversal outright. You're saying that the evidence supports mistake of fact? Yes. The evidence as presented here, which would be the evidence presented at a new trial, supports that this was a mistake of fact. Well, the jury found him guilty after hearing testimony that his whole version of why he was there. So didn't they reject that? The jury wasn't given any tools to make any other decision than the one that they made. Well, they were given a self-defense instruction in defense of others. Yes. And does the opening description of the home invasion have that he entered without authority? Without authority, yes. But they were given the definition. No, I'm saying in the definition, did they get that? Yes. They got the definition. But they didn't get, as the State concedes, which was error, they did not get the issues instruction. Nobody told them that the State had the burden to prove beyond a reasonable doubt that self-defense or defense of others wasn't available to them. So they could have thought maybe it was the defendant's burden. Maybe it was 50-50. But they clearly didn't get the issues instruction. Now, their response is that as far as just moving away from the mistake of fact for a moment, that the error does not rise to the level of plain error. They cite Washington, the Supreme Court case. It says that instructional error generally doesn't rise to the level of structural error. How do you respond? Well, I mean, we cited additional authority with people v. Getter, which is a decision from this court from 2015, where new Justice Ellis goes into an exhaustive explanation of the State's structural error, that second-pronged plain error must be structural error, and noted that the Illinois Supreme Court has never said that it must be structural error to be second-pronged plain error. What does Washington say? We're getting that decision. What does Washington say about instructional errors? Well, they've analyzed it. We have to rebound by what the Supreme Court says. Yes. And the Supreme Court in Ray Samantha V, they analogized second-pronged plain error to structural error. But they found they still went through the analysis of finding that a one-act-one-crime rule was second-pronged plain error. So the court has noted they've kind of made a, to say that something's grave error or serious. Is there a reasonable doubt, though, if the one-act-one-crime rule is violated, you basically don't have proof beyond a reasonable doubt? Well, there's also people v. Walker, where they didn't grant a continuance, where the court found that that was second-pronged plain error. There's also instructional errors, where the court's found second-pronged plain error. Well, the State is basically arguing that we should look at this in terms of harmless error. Because they say it's really not structural, therefore it's not plain error, therefore we look at it to see if it was harmless. Then it would be their burden to prove it's not harmless beyond a reasonable doubt, where this is a self-defense. If it's plain error, it's your burden to show that the error was so grave. Right. Yes. As this court in Getter said, this is a grave error. The jury was given, as I say, they were given all the ingredients but no recipe. So they had nothing, they had no way, even if they believed that Mr. Shull acted in self-defense, they were given no forms, no ability to actually make that decision. They didn't know what the burden of proof was. They didn't know that it was the State's burden, not Mr. Shull's burden. So they were left completely unaware as to how to interpret all of this evidence that they were given. So clearly, in a case that was a credibility contest, in fact, when all of the evidence points in the same way, the State doesn't have any evidence which disproves his subjective belief that there was an intruder. So because of that, all of the evidence combined and taken together show that Mr. Shull subjectively believed that he needed to use this force in order to prevent an intruder from harming his downstairs neighbor. I have a question regarding injury. In your brief, you make light of the injuries that she sustained as a result of going out the window. How are we to determine what the extent an injury is serious as required by the statute? I mean, the statute doesn't define serious. So how are we supposed to determine what is serious and what is not? Well, the statute, as noted in our reply brief, defines serious injury, and then we have great bodily injury. So somewhere in between would be serious bodily injury. So isn't this serious? I mean, she got cut when she was going out. She got cut by glass. Well, the courts have defined bodily injury, just bodily injury, as scrapes, abrasions that don't require treatment at the hospital, that don't require any type of serious medical intervention. But the statute also requires that Mr. Shull would have caused the injury by his surrender, meaning if I can think of an example where I'm surrendering to you and I accidentally shoot you. I mean, that might be something where I'm causing serious bodily injury by my surrender. Well, here she was frightened by his actions, which caused her to go out the window. She jumped out the window and she was scraped up. But Mr. Shull hadn't been surrendered at that point, and she was actually in the house when Mr. Shull actually surrendered. He hadn't surrendered? No. No. So that supports the State's suggestion that there was injury that had occurred. It didn't occur by Mr. Shull's actions. Well, what does the – under our rules, I'm pretty sure that causation in a criminal case is very similar to approximate cause.  It doesn't have to be the cause, but it can be a cause. Well, we know from Maria, which is the only other court that's kind of analyzed the statute, that the harm must be caused by the person in effectuating their immediate – But there it was more direct. I mean, he put his hand on her mouth, and then she was struggling with him. And then that's where she sustained injuries. Exactly. Okay, here, you know, his actions are causing her to go out the window. Yes, his actions are causing her to go out the window. But what's the difference? He didn't cause – she jumped out the window because of a fear that she perceived. Right. But his surrender had nothing to do – his surrender, not the home invasion taken completely differently. He didn't – while he was surrendering to Frank, he didn't cause her injury. Well, that would be a jury question. I don't think that this court is in any position, based on this record, to make that determination. I think that would be up to a jury to decide whether he caused those injuries because of his conduct in coming in there with a gun, holding her friend at gunpoint for several minutes, and then she tried to get out in the meantime. So I don't know that that's something that we would ever conclude. I think that's up to a fact finder. Which shows that this – that trial counsel should have submitted this instruction to the jury, that we have all of these questions about the facts and how this would have played out. At the bare minimum, counsel should have read the home invasion statute and understood that this was an available defense. It didn't contradict the self-defense. Self-defense, mistake of fact, and the surrender defense all go hand-in-hand. It's all about Mr. Shull's belief and his conduct. And all of them are supported by the evidence, and all of them could have been advanced at the jury without endangering anyone or any particular defense.  No, thank you. I reserve a couple of minutes in rebuttal. Certainly. Mr. Kelleher. May it please the Court. There was an error in this case with the jury instructions. However, it did not amount to reversible error. Under the unique facts and circumstances of this case, even if the jury had been properly instructed, it would not have affected the outcome of the trial. And we know that from the facts of this case, as well as the instructions that were provided to the jury. Here, there is overwhelming evidence that the defendant committed the offenses of both home invasion and aggravated unlawful restraint. And also, the state proved beyond a reasonable doubt that the defendant was not justified in using the force he used. Did the definitional instruction of home invasion provide that he entered without justification? Yes, it does.  It doesn't use that language. However, it uses the language without legal authority. Without legal authority. And that's actually the correct terminology. Yes. Justification is not the correct terminology. That's correct. All right. So I misspoke. Okay. You may proceed. I misunderstood. Right. And for aggravated unlawful restraint, it also uses the language without legal authority. And the jury was instructed that the state had to prove beyond a reasonable doubt those elements of both of those offenses. So the jury found that the state had proved beyond a reasonable doubt that the defendant had entered the premises without legal authority and also detained Frank without legal authority. Without legal authority is essentially the same as using force that's unjustified. Well, shouldn't the jury have been told, though, that the burden to prove that he did this without authority was on the state? Just taking the self-defense. The defense of others, rather. Shouldn't the jury have been told that the burden to prove that he did that without legal authority rested upon the state? Well, the committee notes do say that, yes, the jury should have received this instruction. Yes. However, you have to look at all the instructions as a whole. Yes. And the jury did receive the general instruction on the state's burden of proof that they had to prove their case beyond a reasonable doubt and that that burden remained with the state throughout the case. But it didn't tell them that they, that the state had the burden to prove he did this without legal authority, did it? Well, the state also, the instructions also included the general definitions of self-defense. The jury was advised and instructed that the use of force in defense of a person is an affirmative defense, and also the use of force in defense of dwelling is an affirmative defense. Yes, but once it's raised, the burden is upon the state to prove beyond a reasonable doubt that the affirmative defense doesn't lie. Isn't that correct? Yes, and under the circumstances here, the state did prove beyond a reasonable doubt that the affirmative defense was not a valid defense. You had a situation here where there were basically two versions. You had the version of events as told by Tracy Lama and Frank Blazek and supported by the evidence of the police testimony, and then you had defendant's version of events. Now, just because you have two different versions doesn't mean it's a closely balanced case, and that's because defendant's version was just not credible. Well, on the mistake of fact and the surrender defense, counsel's arguing that the lawyer who represented him was ineffective for not presenting either or both of these. And on the mistake of fact, you seem to argue in your brief that because the testimony came through Mr. Scholl that it's not really testimony or evidence that the court would consider in deciding whether or not this was an ineffective representation and prejudice as a result. Isn't the rule that if there's any evidence to support an instruction that the court would normally be required to give it? That's the rule. However, in this case, first of all, counsel never asked for the instructions. No, I know, because it's being raised in the context of ineffective assistance. Right. And it was reasonable because counsel decided that his defense would be defense of others, defense of dwelling. But it's not supported by the evidence here. It wouldn't have been enough to make a difference in this case because defendant's actions were not consistent with him making a mistake. The only mistake defendant made here was thinking that Tracy was still alone in her residence when he went down to visit her the last time. Once he got, once he entered the residence, first of all, the fact that Frank unlocks the door and lets him in, he should have known right then and there, you know, an intruder would not unlock the door for me. But once he got there, if he truly had this belief that he's going to the rescue to protect Tracy, one would certainly expect that he would immediately shout out, you know, Tracy, are you okay? Who is this guy? You know, I've got him. I'm holding him. Call the police, quick. He didn't do any of that. The burden of proof doesn't rest with the defendant, does it? No. Is it proper to argue all these things he should have done? Well, it's important because the jury had to assess the defendant's credibility and the jury had to decide, did he really have a reasonable belief here or is this something that he concocted after the fact, a fabricated story to try to explain his actions of what he did and how, and the more likely, the reasonable finding here, once you look at all the facts, including what he was doing beforehand, which is very significant, it's, he did not act as if someone would act when they, if they had truly believed that they were coming to the rescue of someone. He did just the opposite. He, he was basically concerned about himself. He's saying, I have this big, you know, effing problem. That's what he's saying. He's not telling Frank that he has a big problem. The defendant's talking about himself. He's banging the gun down. He's pointing the gun. He's threatening Frank. Ten minutes passed, maybe 15 minutes. At one point, he hears Tracy crash through the window. What does he say? He says, why is Tracy trying to kill herself? But prior to that, he didn't know who he was dealing with. I mean, Mr. Blazek never identified himself as an acquaintance. He never identified himself as a friend or he never stated the reason why he was in the premises. So at that point in time, the defendant didn't know what he was really dealing with. Correct? So isn't that still a mistake in terms of what he was contending with? It may have been a mistake that the defendant didn't think that Frank was going to be there, but it's not a mistake that amounts to a legal defense, an affirmative defense, because the mistake would have had to be that he truly believed that there was an intruder in the house, and once he got there, he was mistaken as to that fact. But when you look at the surroundings. But why wouldn't he be entitled to that defense? Because there's a number of facts that establish that he really didn't believe there was an intruder in the house. He had made a series of advances towards Tracy earlier in the evening. The defendant's girlfriend was in Minnesota for the weekend. He knew that Tracy's fiancee was out for the evening, wouldn't be home later. He had done some strange things. He had cupped Tracy's cheeks real hard. He had mentioned about coming downstairs naked. But wasn't that kept out by the court through a motion in limine in terms of his supposed sexual advances to her? Well, we never argued that at trial, but he certainly wanted to have some contact with her. Well, the court said you couldn't make any suggestions or insinuations that this entrance was for sexual motivation or something. Right. And that's whether he just wanted to have a cup of coffee with her, it doesn't matter. What he did was inconsistent with someone claiming that there was an intruder in the house. He claims that. Pardon me. I have a bad cold today. Well, let me ask you this. This court in People v. Shelby said that the purpose of the statute is to permit the protection or the safety of others in their homes. Now, wasn't James at the point in time when he is in the premises actually fulfilling the purpose of the statute, he thought that he was protecting or trying to ensure the safety of Tracy at the time when he's in the premises? I think a reasonable juror would have found that, no, he never intended, that wasn't his purpose of going in there. And even if it was, he would have, he could have sorted this out in 30 seconds, but he didn't. He did just the opposite. He dragged it out. In fact, at one point he threatens Frank. He says, if you move, you're F-ing dead. Mr. Keller, is there anything inconsistent about the surrender defense, the mistake of fact defense, and the defense of others? Anything inconsistent about those? In other words, you're not arguing that the defendant couldn't have presented all three and not be inconsistent. And even if he were, he still is entitled to present any defense. Isn't that sort of the general rule of law? Yes, but even if you still have the second prong of Strickland to deal with, that even if counsel had presented these other defenses and the court had allowed these instructions, there's no reasonable probability it would have affected the outcome. Well, maybe on this factual record there is a reasonable probability that if the jury had been given the appropriate self-defense or defense of others burden of proof instruction that the verdict could have been, or there's a reasonable probability it might have been different. Yes, but under these circumstances, our argument is that it would not have. And also, there was, just going back to the alleged defense of surrender. Yes. The whole purpose of that affirmative defense, as it applies to home invasion, is that the legislature understands that there's a number of offenders who just want to break into homes, commit residential burglaries. They don't want to encounter any people. They just want to get in and out. Is that what you think the purpose of this is? I'm curious because I certainly don't think that's entirely unreasonable. I thought there was some concern about burglars and them being slightly different than home invaders. Well, what happens is sometimes when an offender goes into a house thinking there's no one home, they're surprised to find out that there actually is someone home. Yes. Or someone comes home during the commission of the offense. So then the legislature actually provides the defendant with two choices at that point. They can immediately turn around and flee the premises, or they can surrender. Where are you getting your interpretation of the statute from? Well, because the purpose of the statute. Is there some legislative history that suggested that? I'm not saying you're wrong. I'm just wondering if you have some support for your position. I'm not aware of any legislative history. However, there is case law saying that the purpose of the home invasion statute is to protect people in their homes. So once someone immediately turns around and flees the premises or immediately surrenders, that's providing some level of protection to the person. In other words, at least that person isn't going to have to deal with what Frank here had to deal with, where the defendant plays with them, pointing a gun at them for 10, 15 minutes, cocking the hammer back, making threats, slamming it on the counter. Obviously, this was not a scenario that the legislature envisioned this affirmative defense to apply to. What about their argument with regards to that the immediately in the statute does not refer to surrender? That actually refers to leaving the premises. Well, I think a reasonable interpretation would be that the word immediately modifies both leaves the premises and surrenders, but let's say even if it didn't modify surrender, you would still have to surrender promptly. You couldn't just linger for 10, 15 minutes because if that was the case, then the offense of home invasion or aggravated unlawful restraint is already completed. You've already done what the statute doesn't want you to do. You have not protected the person or the visitor in the home. You've done just the opposite. And didn't the defendant do that here, though? Once he determined that Frank Blasick, I believe his name is, was not an intruder and that Tracy was all right, then he surrendered. I mean, doesn't that satisfy the statute here? Actually, the defendant wants us to believe that he surrendered once he determined that Frank was not an intruder. But the reality is, and he even admits this in his testimony, is he turned over his gun because he realized that the police were outside. Already probably 10 or so minutes had passed. He hears Tracy crashing through the window. So, of course, he's going to think, okay, I've got to cut my losses now. And he said he was afraid. He didn't want anyone to get hurt. And I submit that he was worried about his own safety because he said at some point, I didn't want it to look like a hostage situation. If the police had looked in the window and saw the defendant pointing a gun at Frank, who knows what might have happened. So the defendant was really just trying to protect himself and cut his losses at that point. I mean, he got himself into a jam when he went into the house thinking Tracy was going to be alone and now he has this other person to deal with, which was totally unexpected. And I might add his story about seeing this silhouette. Well, do we know how Frank got in the house? Did he go in the back or did he go in the front or where did he go? Actually, that's very significant. Frank came in the front door. How do we know that? Did Frank say that? I believe it was either – oh, I'm sorry. It was Tracy's testimony. Tracy testified that Frank came in the front door. And the stairwell that the defendant was talking about that went up to the front, the first floor and the second floor, the stairwell was in the backyard. And there was also testimony that the landlord had run a construction business. Landscaping.  And it wasn't uncommon for there to be people coming and going, even at night and making noise. So this story about Frank seeing this silhouette in the back is really undermined by the testimony about the landlord having a landscaping business and the fact that Frank came in the front door. The defendant would not have even seen Frank come in the front door. But aren't these all things that really relate to whether it's believable or not, as opposed to if there's evidence to support an instruction, then the court usually – or the court is required to give it? It's not like a weighing process. The court doesn't decide how believable the evidence is when giving instructions, does it? I mean, if there's no evidence to support an instruction, obviously the court doesn't have to give it. But I don't think that the trial court goes through a weighing process in deciding, oh, this isn't really believable, so I'm not giving you this one. If there's slight evidence, the court can give the instruction. Yeah. My point in saying that it wasn't believable is to – Is it less than slight? I'm sorry. That it would be less than even slight evidence. I think that's what you're saying, that this wasn't even slight evidence. Yes. And also, even if the instruction had been given, if the jury here had been properly instructed, the ultimate question is, would the result have been any different? And because of the overwhelming evidence here and the fact that the jury did not buy the defendant's argument, they found that the state had proven that the defendant had entered without legal authority and had held Frank without legal authority. It's essentially the same as if that instruction had been given that the state had to prove that the defendant wasn't justified in using force. In Getter, you had a different situation. There you had four different offenses. And the jury was instructed on the – without lawful justification – on every other offense. The attempt murder, I don't know, aggravated battery, I don't know. There were multiple charges, and every one of those got the instruction, but then the aggravated discharge was singled out without having that instruction. Exactly. So the court found that the jury had received mixed signals, and the court said that the error there wasn't that the jury had misconstrued the meaning of self-defense or that the burden of proof had been reassigned. The court found that the error there was that the jury had no way of knowing that the defense of self-defense applied to the aggravated discharge charge. Here you don't have that situation because – They weren't told that the state had to prove it. But they were given the instruction saying that the state had the overall burden of proof, beyond a reasonable doubt. And also you didn't have the inconsistency here where it was given, say, on the home invasion, but not the aggravated and lawful. So you didn't have the mixed signals here that were present in Getter? Yes. Is there a mixed signal as far as plain error and structural error that we have going on with the several Supreme Court cases that speak to structural error versus plain error? I think the Supreme Court has recently cleared up that. In what case? In Glasper and Thompson, where they equated – Well, that's right. They've equated it, but they've never come out and said that this is the only kind of plain error we have. Have they? Well, they essentially followed a U.S. Supreme Court, and the U.S. Supreme Court has found plain error in a very limited number of circumstances. Yes. And even in the case of – Illinois Supreme Court case of Washington, which involved a failure to give a jury instruction, the court said that it's not subject to automatic reversal, and that's it's structural. In other words, there are going to be cases where a jury instruction and error amounts to reversible error, but there are also going to be plenty of cases where it doesn't, because when you look at everything, the facts of the case, the instructions that were provided, the court can make a determination, you know, would the effect have been different? And so in Washington, where the defense had requested the instruction, they basically applied a harmless error analysis. So the Illinois Supreme Court contemplated that there are going to be a number of cases where, yes, there's an error in the trial process where, you know, the instructions weren't perfect, but it didn't affect the fundamental fairness of the trial. And that's what it has to do. The error has to be so grave or systemic that it denies the fairness of the trial? Yes, to amount to reversible error. And in some cases that will be the case. Our position is when you look at all the evidence in this case and you assess the credibility of the defendant's version of events, no reasonable person would have believed the defendant's story, because so many things he tried to explain afterwards. He tries to explain his comment about coming down naked. He's saying, oh, that's a quote from a movie, which doesn't even match. He tries to suggest that, oh, the door was slightly ajar, and I just was banging on it, it kind of opened. Now, the reality is Tracy was so scared. She didn't want to be alone. Do you think she's going to leave the door unlocked, unbolted? She was so scared. She called her boyfriend, called a friend to come over. She didn't want to be alone. She was terrified. And then when the defendant comes in the house, you know, he doesn't do what a reasonable person would assume that someone would do under that situation, which is to protect Tracy. He doesn't call out. He proceeds to terrorize Frank for at least ten minutes. That's not someone coming to the rescue. He didn't call the police. There's so many things he could have done. I mean, imagine a world if that was the law. Anytime anyone saw something suspicious down their street, heard an unusual noise, saw someone go into a house, a neighbor could go to that house with a loaded gun, a .357, start taking hostages, you know, even if there's a visitor at the house, could just hold him at gunpoint, not call the police, bang the gun on the counter. Well, there is an argument that was made that now in light of Aguilar, you know, his using that gun, does he get to use a gun that's registered to someone else, though? They argued that you could do this, but I didn't know it went as far as that. In other words, I don't know that you could use a gun that's registered to someone else. No, I don't believe he could. I don't know. Maybe he can't. I'm not sure. And also, he had left his premise. That's kind of foggy, too. Right. Maybe we don't know. But in any event, you know, it's what he was doing with the gun. Yes. Whether he had it legally or not is really not even necessary to determine. All right. Anything further you want to add now? I think we're going to have to have you sum up. No. Justice Raven, any more questions? No. All right. For all of these reasons, as well as those stated in our brief, people respectfully request that this honorable court affirm the defendant's conviction. I'm going to just ask that we take a short recess, and then we'll be right back with the brief follow-up. Thank you. Thank you. Thank you. Thank you.  You may proceed. I want to start by clearing up a couple of factual inconsistencies. Mr. Scholl, immediately after this happened, told the police that he believed that there was a burglar in the house. This wasn't just late stage, a year and a half later testimony. He told the police on the scene, I thought there was an intruder. And he actually said the words, I made a mistake. So this is not something he's just creating when he's sitting in the chair. As far as him not having a void card, that could have been something that they could have charged. His non-use of the weapon, it doesn't mean that they had to pursue the home invasion defense. As far as this fear that Tracy had, Jim had no way of knowing that she was in any way, shape, or form afraid of him. She had hung out with him the entire evening. The last words that she said to him were, my fiance and I will be coming to your home tomorrow morning to help you with your computer. My fiance is on his way home, by the way. So last thing he heard was that they're going to come up and help me tomorrow morning. Fiance is on the way home. He didn't have any idea maybe that this was a really psychologically damaging experience to her. And regardless, what she believes in her mind can't be imputed to what he thought when he entered the home. Jim did say, as far as the surrender goes, that he believed that the police were outside. We do know, and the evidence shows from Frank and from the police officers, that the gun was dismantled, and that he had formally surrendered before the police picked up the phone and called. Frank even said, I didn't even know the police were there as we were talking. Jim just releases the bullets. He sets the gun down. That's clear. Mr. Sherrill, again, this is a very extremely pressured situation. Kind of got that sequence in error. As far as the looming figure that they say that no reasonable person would believe that he actually could have thought that someone was there on the property, the parking lot was in the back. So Frank would have had to have walked around the building somewhere in Mr. Sherrill's eyesight to even get to the front door. Again, these are all factual questions that a jury could have worked out had they been properly instructed. As far as the meaning behind the surrender defense, the home invasion statute provides for the accidental residential burglar. Because the home invasion statute says, you commit home invasion once you know that someone is present in the house. So if I intend to burgle your house and I'm inside and I don't think you're home, once you come in and I see you, it's not just surrender immediately leaves. I'm not guilty if I don't reasonably believe that someone is there. So I think that the surrender statute could accommodate both the accidental burglar and the accidental person who makes a legitimate mistake. Counsel said to the jury, this man made a mistake. The trial court in sentencing said, you made a mistake. One mistake. Mr. Sherrill said, I made a mistake. Even Frank, when he was talking about the weird conversations, was saying that Mr. Sherrill was confused and didn't really get it until the end of the conversation. This was clearly a mistake of fact defense. It should have been offered to the jury. Again, the Illinois Supreme Court has never limited second-pronged plain error to only the structural errors. This was a jury not just given a definition. They were not told what the burden of proof was. They were not told that it was of the state's burden to prove beyond a reasonable doubt that he did not have the reasonable belief in needing to use self-defense. So this goes beyond more than anything that were commonly occurring. This was the jury not instructed about the burden of proof beyond a reasonable doubt. If there's no other questions. Case was well-argued and well-briefed, and we will take it under advisement. Thank you both. Thank you.